IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| JAMES DEWELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 07-3003 |
| | ) | |
| JOHN E. POTTER, | ) | |
| POSTMASTER GENERAL, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

RICHARD MILLS, U.S. District Judge:

Pending before the Court is the Defendant's motion for summary judgment.

## I. BACKGROUND

In September 2005, Plaintiff James Dewell was hired by the United States Postal Service ("USPS") as a part-time flexible ("PTF") mail carrier. Although Dewell claims that he performed his job in "a satisfactory manner, or while a trainee, was making satisfactory progress toward competence," the Postal Service terminated Dewell's employment due generally to what it alleged was his poor job performance, including unreported damage to

Postal Service property.  Dewell claims that, prior to the property damage, he had been told that he was making great progress.  At the time, Dewell was still within the 90-day probationary period and was not a permanent employee.

Dewell alleges that his termination on November 17, 2005, was a direct result of unlawful discrimination against him due to his military disability.  He claims that he left the United States Marine Corps with the residual ten percent service-connected VA disability relating to a chronic back condition.  The Postal Service terminated Dewell for the stated reason that he had failed to report a property damage accident.  Specifically, a charging cord was pulled away from a socket when Dewell moved a vehicle. The wall socket was damaged when Dewell drove off.  Dewell contends that this was a minor incident and not a true motor vehicle accident.  The Postal Service asserts that Dewell failed to make a complete safety check of his truck before beginning his route.

The Postal Service asserts that, although Dewell claims that he was treated differently than a similarly situated employee, there was no similarly

2

situated employee with whom the Postal Service dealt differently.  The one other employee who was involved in a vehicle accident shortly after she began with the Postal Service had completed her probationary period and had become a permanent employee at the time that her accident occurred. Moreover, that employee had reported the accident and was disciplined within the limits of the union contract that applied to permanent employees.  She was considered a good or even an outstanding employee.

The parties dispute whether the accident was immediately reported. Although the Postal Service asserts that he failed to report the accident as soon as it was immediately required, Dewell alleges that he reported the incident as soon as it was discovered and he could locate a supervisor.

Dewell's complaint indicates that he is asserting claims pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., though the ADA does not apply to federal employers.  The Rehabilitation Act of 1973, 29 U.S.C. § 701 et seq., which uses the same definitions of disability as the ADA, applies to Dewell's claim that he was unlawfully terminated.

## II. FACTS

### (A)

At his deposition, Dewell testified that he had pain in the lumbar region, the lower five vertebrae in the spinal column. Dewell was in the Marine Corps and, following a morning run, he sustained a back injury, was treated and put on light duty. Dewell was no longer capable of carrying a rifle or participating in the 3-mile run and weekly hikes with the battalion, as required of all Marines. When walking for any distance of, hypothetically, two miles, Dewell would require a break of one or two minutes to release the pressure from his back. However, Dewell's back did not prevent him from effectively managing a job as a cryptographer. He received a medical discharge. The injury did not affect his sight, hearing or speaking. He has discomfort in his back when trying to fall asleep.

As required of the Postal Service application process, Dewell was required to identify any medical disorders or physical impairments which might interfere in any way with the full performance of duties of the position for which he was applying. Dewell indicated that he had none. In

4

the application process, Dewell acknowledged the "Functional Requirements" of the carrier position.  Among these were "heavy lifting up to 70 pounds, heavy carrying 45 pounds and over, straight pulling four plus hours, pushing four plus hours, reaching above shoulder, use of fingers, walking eight plus hours, standing eight plus hours, repeated bending eight plus hours, climbing legs only eight plus hours."  Dewell never told the Postal Service that he suffered pain and pressure when he walked for a mile.  He does not recall ever informing any of the three supervisors that he had physical difficulties.

Dr. Steven Ginos was Dewell's regular physician.  Dr. Ginos affirmed to the Postal Service that Dewell was healthy and able to perform a "postal worker's job," including walking six to seven miles per day carrying 35 pounds and occasionally 70 pounds walking short distances.  Dewell did not see Dr. Ginos during his period of employment with the Postal Service.  Although Dr. Ginos is aware that Dewell has a 10% disability rating from the Veteran's Administration ("V.A."), he has never reviewed Dewell's records from the V.A.  Dr. Ginos received no calls from Dewell regarding

5

back complaints while he was employed with the Postal Service.  Dr. Ginos described the nature of Dewell's back problem as "episodic," short-lived severe back spasms that "responded well to treatment, and then he would go about his daily life."  The problem was chronic, according to the doctor.

On July 7, 2005, Dr. Ginos received a phone call indicating that Dewell was applying for a postal service job and was requesting a letter stating that he was able to perform a postal worker's job.  Dr. Ginos sent a letter to the Postal Service stating that Dewell was capable of walking six to seven miles per day, carrying 35 pounds and occasionally 70 pounds walking short distances.  Due to the wording of the letter, he believes that, most likely, he was looking at a description of the requirements the Postal Service set for the job.  Having seen letter carriers, Dr. Ginos assumed that the job for which Dewell was applying involved "you walk a certain distance, you come back to your vehicle, you drive to the next location, you get out, you walk around and get back in and drive again."

The difficulty Dewell had with his back did not limit his ability to walk six to seven miles per day, walk up or down stairs, or perform normal

6

daily life activities.  If he wished, Dewell could ride a bicycle, play softball, football and tennis.  There were no sports which would have been eliminated due to his medical condition.  Dewell was capable of pushing a mail cart, reaching above his shoulder.  He could climb, he had use of all of his fingers, and he possessed mental-muscular coordination.  In fact, Dr. Ginos believed that given Dewell's problems with weight control, having a job that required six or seven miles of walking a day would have been beneficial.  Dewell's back might, however, affect his ability to lift from time to time.  If Dewell did something to acutely exacerbate his back, he might have muscle spasms and require muscle relaxers and Ibuprofen.  When Dewell's back "acted up," he was "pretty much down in bed."

In his sports medicine practice, Dr. Ginos refers patients to physical therapy multiple times a day.  However, he never referred Dewell to a physical therapist for his back complaint.  Dr. Ginos has referred patients to pain management specialists when physical therapy has been ineffective; however, he never referred Dewell to a pain management specialist.  If a patient failed to respond to therapy, Dr. Ginos might then order a CAT scan

or an MRI.  He never ordered a CAT scan or an MRI on Dewell for his back problems.   Dr. Ginos gave Dewell one work excuse and that was in December 2001, for three days.

On May 15, 2007, Dewell came in for a physical and informed the doctor that he was on the Quincy University football team and "was able to withstand the exercise routine at that time."  Dr. Ginos saw no reason why Dewell should refrain from football.   Dr. Ginos would agree with the conclusions of Dr. Wheeler, who upon examination of Dewell, determined:

> Impression: Healthy 28-year old male who is evaluated for a U.S. Postal Service position.  History of previous lumbosacral spine stain while serving in the military.  He carries a 10 percent disability from the Marines.
> Three: Chronic lumbosacral spine strain with occasional infrequent episodes of recurrent symptoms in the same area of the back previously injured.
> Four: I find no evidence of disc disease or . . . radiculopathy.  I find the patient to be employable in whatever capacity is desired, particularly in reference to this position for which he is being considered by the U.S. Postal Service. . . .
> Six: I find no restrictions in his ability to be employed and perform those tasks required as outlined in the duties and responsibilities list, including all functional requirements and environmental factors.

Dr. Ginos defined the term "disability" from a medical point of view, in

pertinent part, as "a limitation in what you're able to do.  If there is something in your life that you were able to do before the disability that you cannot do after the disability, then you're obviously disabled from that activity."  Dr. Ginos did not consider Dewell disabled as per the doctor's definition of the medical term.

### (B)

John Beck was the Postmaster of the Quincy, Illinois, Post Office at all times relevant to this action.  Beck was responsible for nearly 200 employees and mail processing in 127 cities in three zip codes.  As Postmaster, Beck had experience in procedures for hiring, promoting, corrective actions and removals.  Although supervisors are in charge of carrier duty assignments and employee evaluations, the supervisors reported directly to Beck and he made final determinations in hiring and firing decisions for the Quincy Post Office.  Together with Melissa Allen, Beck interviewed Dewell for a position as a letter carrier.

Beck knew that Dewell had been in the military.  Dewell's Certificate of Release or Discharge from Active Duty showed the "Reason   for

Separation" was "Medical Discharge."  The document also indicated that he was "subject to active duty recall and or annual screening."  Beck had no further information regarding the reason for discharge.  Dewell indicated that he was able to meet the physical requirements for the carrier position.  In the regular hiring process, every candidate completes a medical questionnaire which is sent to St. Louis, Missouri.  If the personnel office in St. Louis approves hiring, Beck assumed that the candidate met all physical requirements for the position for which he applied.  Beck had no reason to doubt Dewell's physical capacity for the carrier job.

During the hiring process, Beck and Allen made it clear to Dewell that there was a 90-day probationary period.  They informed Dewell that this 90-day period was an opportunity to determine whether he, as a probationary employee, was suitable for the position of letter carrier.  Beck and Allen informed Dewell, as they did all prospective employees, that not everyone passes the probationary period and if, during the first 90 days, Dewell should not perform at a satisfactory level, he would be terminated.  Beck and Allen made it clear that such action would not be "personal," but

was the result of Postal Service requirements.

Beck was always aware when a probationary employee's 30-day review was approaching and he always conferred with supervisors to check the performance level of any new employee. The three supervisors, Allen, Lynn Atchley and Terry Harrison, were critical of Dewell's performance. However, Beck never removed a probationary employee after just 30 days. He did not believe that 30 days was a sufficient period of time in which to make a final determination regarding an employee's performance. During the 30-day evaluation period, Dewell was informed that his job performance was not satisfactory.

The Defendant claims that, at the 60-day review, Beck learned that Dewell had not improved to the level needed for a postal carrier. This was based on the reports of the three supervisors. Dewell's rating continued to be unacceptable in some areas. For several reasons, however, Beck did not want to terminate a probationary employee. Dewell disputes this allegation in part, contending that he was told privately by Allen that he had improved and management was "happy" with his progress.

Whenever Beck learned from supervisors that a carrier was not performing adequately, he went out and observed that carrier on his route so he could assess the carrier's on-the-job performance.  Beck believed that he had a responsibility to determine whether he personally agreed with the supervisors' assessment.  Moreover, Beck believed that he should determine, through his own observation, whether a carrier's performance might be corrected and brought up to an acceptable level.  Finally, Beck believed that he should observe the carrier as the public perceived him.  Therefore, in addition to speed and efficiency, Beck observed the carrier's attitude toward the public.  While carriers must be courteous, a carrier's schedule does not allow for unnecessary conversation.

To confirm for himself Dewell's ability or lack thereof as a letter carrier, Beck observed Dewell on a street delivery route.  Beck did not inform Dewell that he was coming.  Beck parked approximately one-half block from Dewell's location and used a pair of binoculars to closely observe.   Beck observed Dewell's performance delivering mail for approximately two hours.  Beck moved his vehicle whenever Dewell moved

12

his Postal Service vehicle on his park and loop route.  Dewell was on a route to which he had been assigned on several previous occasions.  Beck noted that Dewell did not appear to have any difficulty lifting his mail bag or walking.  Beck found that Dewell failed to move purposefully and efficiently during his deliveries and he appeared "lackadaisical."  Dewell failed to take advantage of obvious shortcuts and showed no sign that he recognized the importance of remaining on a strict schedule.

When a carrier returns to his vehicle he usually goes to the back of the vehicle to retrieve his mailbag, after which he is prepared for the next relay. Some carriers prefer to move the vehicle to the next relay point and to then go to the back of the truck and refill the bag.  Dewell went to the back of the truck on both occasions, thus doubling the amount of time that he spent on this task.  Dewell took approximately 4-5 minutes to prepare for each loop, instead of the typical 1-2 minutes.  When a route has approximately twelve park points, an extra two minutes can substantially extend delivery time.  Beck was aware that Dewell required repeated assistance on the routes to which he was assigned.  Beck's observations established no

13

reasonable explanation for Dewell's failure to complete his assigned routes in a timely fashion, other than a failure to use his time effectively and remain focused. The Postal Service must be concerned with time. If the mail is not delivered timely, mail will not be collected timely. If the mail has not been collected, it cannot be sorted. If the mail cannot be sorted, it cannot be sent to its ultimate destination timely.

All postal employees are required to clock in and maintain time sheets. A review of Dewell's time sheets show numerous entries of "delete clock ring," which means that Dewell made an inaccurate entry and an office employee was required to make corrections to his time sheets every day he worked. Beck expected a new employee to have some difficulty making correct entries in the first 30 days, but Dewell's time sheets show that corrections were required every day he was on the job before he was terminated. Such corrections require another employee, who has other duties to which to attend, to make time-consuming corrections.

(C)

14

Letter carriers are trained from the very first day on the job to observe safety precautions. This includes a complete vehicle check each time a carrier prepares to take one of the Postal Service vehicles. A complete vehicle check can only be achieved by walking around the entire vehicle and checking all four sides of the vehicle. A safety sticker is in the front windshield of each vehicle to remind employees of this responsibility. The Defendant alleges that when Beck learned Dewell had backed a 2-ton truck out without first unplugging it and had then failed to report the accident, that was the "final straw" and he agreed with the three supervisors that Dewell should be terminated. As noted in the photographs of a 2-ton truck at the Quincy Post Office, it is impossible for any postal employee to have done a complete vehicle check and "walk-around" without literally tripping over the cord by which the 2-ton truck is plugged into the wall socket. Dewell disputes this allegation, claiming that one could walk to all four sides of the vehicle without seeing or encountering the cord, especially if one had not been alerted to the existence of a cord.

The Defendant further asserts that Dewell's failure to unplug the truck

certainly qualified as an accident or incident.  A supervisor was always available at the Quincy Post Office even after the last carrier returned from deliveries, yet Dewell failed to report the accident to a supervisor the day it occurred.  Beck reviewed Dewell's Employee Evaluation and/or Probationary Report ("evaluation form") and wrote the word "concur" and his name, meaning that he concurred with Dewell's termination.  Beck believes that he wrote this on the original of the form.  Dewell's file was produced during the EEO process and subsequently sent to archives.  Dewell disputes this allegation to the extent that a supervisor was present at the office.  He claims that neither Atchley nor any other supervisor was available in the four o'clock hour on November 16, 2005.

The Defendant states that Beck has examined a copy of the evaluation form which Dewell asserts was altered.  Based on his review of the form and his signature on the form, he is certain that the document is as it appeared on the day Dewell was terminated.  Beck reviewed and signed the evaluation form to establish his concurrence after Dewell was actually terminated.  The evaluation form shows some "unacceptable" ratings at the 60-day review,

and it was these critical ratings which prompted Beck to go out and observe Dewell on his route.  The evaluation form also comports with the verbal reports he had received from the three supervisors during Dewell's probationary period.  Dewell contends that the 60-day review form was altered between November 9, 2005 and November 17, 2005.

The Postal Service is concerned with the safety of its carriers.  Carriers are informed that, should they be involved in an accident, or even in an incident, they are immediately required to inform a supervisor.  They are also required to complete an operator's report of accident, known as an SF 91, before going off duty on the day of the accident.  Dewell disputes this to the extent that there is no training to report an accident when a supervisor is not present.  Official accident reports are completed by supervisors, who then file such reports with the Post Office in St. Louis.

In 2005, when Dewell was working as a PTF carrier in Quincy, there was an additional safety reminder at the supervisor's desk where the weekly schedules were maintained on the work room floor.  Next to the weekly carrier schedule was a typed reminder to all carriers that as the weather got

colder, they should never let the fuel tank in a 2-ton truck get below a fourth of a tank low and they should also remember to plug in the batteries on the 2-ton trucks. Another safety reminder was posted within a few days of the October, 2005 date on the notice. The reminder was posted on a bulletin board which all carriers pass at least twice a day when they enter the work room and again upon their exit. This "Notification of Accidents and Incidents" stated:

> This correspondence is to remind all employees of the importance of notifying their supervisor or manager IMMEDIATELY when they are involved in a job-related accident or incident. . . All employees must report any job-related accident or incident to their supervisor as soon as the occurrence takes place, regardless of whether medical treatment is necessary.

Allen was one of three supervisors when Dewell began his 90-day probationary period as a letter carrier in September, 2005. On September 8, 2005, Dewell completed driver's training and the vehicle operation test for driving the Postal Service Long-Life Vehicle ("LLV") and 2-ton truck. A safety check sticker was in each vehicle to remind carriers of the safety check they are required to perform before driving a Postal Service vehicle.

18

In addition, an expanded safety check card is given to each new employee at driver's orientation to remind the employee of the check he is required to perform on a Postal Service vehicle before he takes the vehicle out.  This expanded safety check also appears in the M-41 Handbook.   In cold weather, a charging cord runs from a socket in the maintenance building at the Quincy Post Office.  This cord hangs from the left driver's side of the 2-ton truck at approximately shoulder height and is clearly visible.

(D)

Allen recorded Dewell's route assignments and the dates on which he required assistance.  Allen also makes a record of dates on which a new PTF carrier required assistance to complete his route assignment.   Dewell completed on-the-job training on September 12, 2005, and walked his first route the next day.  Dewell required the assistance of other employees on twelve occasions in September, 2005 to complete his route assignments, despite the fact that Allen had allowed an additional two to three hours during the first couple of weeks over the time an experienced carrier would have required to handle the assignments.  Dewell called in and requested

assistance on these occasions and, although it required another carrier to do additional work, Allen always provided the assistance Dewell requested. On September 26, 2005, Dewell required two hours of assistance to complete Route 23; Allen then had a discussion with Dewell about his job performance. Allen explained that the Post Office could not continue to send carriers to assist him. The next day, Dewell required 9.5 hours to complete Route 23. Allen had estimated this to be approximately five hours of work. On September 28, it was necessary to send another carrier to assist Dewell for two hours on Route 23. Allen had also removed three long relays off Route 23 so she had estimated that Dewell would finish within the allotted time. Dewell nevertheless began collections late.

The Defendant claims that Allen believes that on either September 28 or 29, 2005, several carriers returned to the Post Office with comments about Dewell. She wrote these comments in her daily log. These carriers indicated Dewell had said words to the effect that he was a compensable veteran; he had a government job and he could therefore relax and not work hard any longer. Dewell denied having made the statements. Therefore,

Allen disregarded the statements and did not allow the statements to influence how she treated Dewell or how she regarded him as an employee. In responding to these allegations, Dewell claims that the dispute is when Allen acted on this "gossip." She waited until on or about November 9, 2005, to discuss it with Dewell. These statements influenced her enough to cause her to bring them up with Dewell six weeks later.

Dewell was not adjusting to the requirements of the carrier's position as quickly as had been expected. Therefore, Allen provided Dewell a full day of retraining on September 30, 2005, with an experienced carrier. Allen hoped that by observing a different experienced carrier, Dewell might learn a method for organizing his deliveries that would work effectively for him. Nevertheless, on November 2, 2005, another carrier provided 2.5 hours of assistance to Dewell in order for him to complete his letter deliveries.

All probationary employees are evaluated after 30 days. Allen obtained input from Atchley and Harrison, the other two supervisors, when she was preparing Dewell's evaluation. Probationary employees are graded on six factors and can be rated: Outstanding, Satisfactory, Unacceptable or

Not Observed.  Dewell never received an "Outstanding" in any category.
He was rated "Satisfactory" in some categories and "Unacceptable" in other
categories.  Dewell failed to work at a "sufficient speed to keep up with the
amount of work required by the position, failed to accomplish tasks in an
efficient and timely manner, and failed to make productive use of time when
completing assignments."  At 30 days, Dewell's work quality was generally
satisfactory, although supervisors agreed that he failed to perform work
which met the expectations of the position.  Dewell's dependability was
"Unacceptable."  Dewell failed to complete work assignments without
unnecessary supervision and failed to take responsibility for completing his
own work.

Allen recalls that Atchley and Harrison suggested that Dewell be
terminated at that point.  Allen met with Dewell and explained the
concerns, but indicated that she believed he could do the work if he made
additional effort.  Dewell initialed the evaluation in box 7c at the conclusion
of the meeting.  Dewell did not then, nor did he ever, inform Allen that he
suffered back pain or that back pain prevented him from completion of his

22

duties in a timely fashion.  He never informed her that he had any physical limitations that in any way affected his performance on the job.

As Dewell was having such difficulty managing different routes, on October 17-25, 2005, Allen arranged to assign Dewell to a single route, number 21.  This arrangement was highly unusual.  Allen had never felt compelled to assign a probationary PTF carrier to a single route when he was in his second month of employment.  However, Dewell had proved himself unable to manage route changes.  Allen nevertheless hoped that Dewell would establish his own workable system for managing deliveries if he were assigned to a single route for a week and he could then apply these management techniques to other routes.

The Defendant alleges that at the 60-day review, Atchley, Harrison and Allen again discussed Dewell's work in general.  As Allen recalls, Atchley and Harrison were of the opinion that Dewell's work was far below the satisfactory level and that he should be terminated at 60 days.  Allen filled out the evaluation.  Dewell's work was still "Unacceptable" in a number of respects.  Dewell's work quantity was unacceptable; he failed to work at a

sufficient speed; he failed to accomplish tasks in an efficient and timely manner; he failed to make productive use of his time when completing assignments. Dewell's work quality, which Allen had rated as "Satisfactory" at the 30-day rating, was "Unacceptable" at 60 days. Dewell had not sufficiently improved. Rather, Dewell not only failed to perform work which met the expectations of the position, he did not work in a careful, alert and conscientious manner to ensure the accuracy and completeness of his work. Although Dewell's dependability was satisfactory, he failed to complete work assignments without unnecessary supervision. Dewell disputes these allegations, asserting that they are contrary to Allen's documentation and her representations to him at the 60-day conference on or about November 9, 2005.

Allen tried to be encouraging when meeting with Dewell, as he still had time in which to demonstrate his ability before the 90-day probationary period was up. Dewell was intelligent and Allen knew of no obvious reason for his inability to manage the carrier position. Allen reviewed the evaluation with Dewell, informed him that he had improved in some ways,

24

but that he had to improve more.  Allen informed Dewell that she believed he could successfully complete the work.  Dewell offered no excuses for inadequate performance and never indicated that a physical or medical problem affected his performance.  Dewell initialed the evaluation in box 8c and handed the evaluation back to Allen.  Beck, the Postmaster, was aware of Dewell's work.  Other employees were perturbed at the assistance they were being asked to provide to Dewell in his deliveries, as it required extra work from them.  The Postmaster alleges that on November 12, 2005, Allen sent another carrier to assist Dewell for 1.5 hours and again on November 14, Allen sent another carrier to assist him.  Dewell disputes this allegation, claiming that he received assistance only one time after his 30-day review.

Late in the morning, on November 16, 2005, the vehicle maintenance supervisor contacted Allen and stated that apparently one of the trucks was driving around town with a cord hanging off of it, as someone had driven off and ripped the cord out of the wall.  Atchley and Allen sent Clyde Wilson out to check the 2-ton trucks on the street and Wilson called the Post Office.  Allen learned that Wilson had determined that the truck in question

had been driven by Dewell.  Wilson indicated that he had seen the cord in the back of the truck.  The cords are supposed to remain in the wall.

Dewell never reported the accident.  Beck, Atchley and Allen all agreed the same day that the accident occurred that, as the result of the poor performance history and the unreported accident, Dewell should be terminated.  Atchley volunteered to be the one to inform Dewell of the decision.  She met with Dewell in the delivery office with the door closed. Allen was aware that Atchley would give Dewell the opportunity to either quit or be fired.  After a few minutes, Atchley indicated that Dewell wished to think about the choice.  As far as Allen then knew, Atchley and Dewell met and then Dewell left the premises.  Shortly after Allen believed that Dewell had departed, Dewell returned.  Atchley and Allen were together in the supervisor's office and Dewell informed them that he had spoken to the union steward.  He indicated that the union steward had suggested to Dewell that Dewell should file an EEO claim.  Dewell requested a letter stating that he was being fired.  Allen typed such a letter, which identified both the unreported accident and job performance during the probationary

period as reasons for the termination.   Dewell also requested any documentation the Post Office had relevant to his performance.   Allen provided a copy of all three pages of her personal daily log, which consisted of relevant notes on Dewell's performance.   Prior to providing these notes to Dewell, Allen took a pen and scratched out the names of other employees.   She did not feel it was appropriate to reveal their names.

(E)

The Defendant further asserts that, in addition to Dewell's difficulty in completing deliveries timely, Allen reviewed Dewell's time sheets, known as Employee Everything Reports.   On this report, an employee notes his "clock-in" and "clock-out" times, and also enters codes for his different assignments during the day.   The codes may have been difficult to grasp the first two weeks but after 30 days, carriers seldom make errors in this report. Allen noted that the timekeeper had to correct Dewell's clock rings on the report every day that Dewell worked at the Postal Service.   This was very time-consuming for the timekeeper and Allen would normally have taken more note of it in a determination to fire an employee, but Dewell's

27

problems with deliveries were so overwhelming that his inability to enter clock rings accurately became simply one more difficulty among many.

Damage to the wall socket as a result of Dewell's failure to unplug the truck before pulling away cost the Postal Service $77.07 for labor and parts to repair.  Dewell has asserted that another employee, A.M., was both similarly situated and treated differently and he has asserted that this difference was due to the Postal Service's unwillingness to accommodate his medical disability.  However, A.M. had completed her probationary period at the time of the accident.  A.M. also reported the accident immediately. As A.M. had completed probation, the Postal Service's action for the accident was governed by and limited by union rules.  Further, A.M. was an "Outstanding" employee, while Dewell was "unsatisfactory."  A.M. was subsequently involved in another accident with a postal vehicle, but the accident was not her fault.  She reported the accident immediately and the Postal Service did an on-site review while the police were still at the scene.

During his entire period of employment, Dewell never stated to Allen that he suffered any physical limitations that affected his ability to perform

28

his job as letter carrier.  Dewell never informed Allen that he suffered back pain and he never indicated that back pain in any way influenced his ability to complete his work.  The Defendant asserts that Allen has reviewed the evaluation on Dewell.  She is quite positive that the ratings on the form are the same ones that she discussed with Dewell.  She noted no changes in the document.  Allen notes that in box 3d, the two "U's" appear darker than some other writing on the form.  However, the ratings as they appear on the form are the ones Allen discussed with the other supervisors and with Dewell at the 30- and the 60-day reviews.  Dewell contends that the document was altered and claims that the dispute could be easily resolved by an expert analysis of the original which Dewell does not have.  Dewell was terminated because he was not an effective and reliable employee.  His termination had nothing whatever to do with his claimed disability.  Failure to report an accident during the probationary period was, alone, grounds to terminate a probationary employee.

(F)

In September 2005, Lynn Atchley began her duties as Supervisor of

29

Distribution Operations.  Dewell never mentioned to Atchley that he had a medical condition.  Based on her experience, she knows that the Postal Service would not have hired Dewell had there been any question about his physical ability to serve in the letter carrier position.

Atchley, like the other two supervisors, believed that Dewell was performing unsatisfactorily in several areas.  Atchley, like Terry Harrison, thought Dewell should be terminated after the first 30 days.   Both supervisors also thought Dewell should be terminated after 60 days.

Postmaster Beck, along with Allen and Atchley, agreed that with Dewell's past poor performance history, his failure to report the accident with the power cord was the "final straw" and he could not be allowed to continue his period of probation.  Atchley had a copy of Dewell's evaluation report in front of her at the time.  She is certain that it showed several "Unsatisfactory" ratings at 60 days, just as she recalled from the discussion of Dewell's 60-day evaluation.

On the day of Dewell's termination, which was the day after the accident, Atchley informed him that the reasons for the termination

included Dewell's failure to report the accident with the truck and his past performance history, which was poor, as noted on the evaluation form. She gave Dewell the opportunity to quit rather than be fired. Dewell indicated he desired some time to consider the option. When Dewell had made his decision, Allen typed up a termination letter. Dewell alleges that, while these allegations are technically true, it creates a "false light." Dewell claims that he approached Atchley to report the accident and she gave him the "quit or be fired" decision before he could speak.

Atchley is herself a disabled veteran, and would never treat an employee with a medical condition any differently than she treats any other employee. She did not know of his medical condition and she did not treat Dewell any differently than any other employee. Dewell was terminated because he was not performing his job despite all efforts to assist him to achieve adequate performance, in addition to his failure to report an accident or incident during the probationary period.

In August 2005, Terry Harrison became the Supervisor of Customer Service at the Post Office in Quincy. He assisted in training Dewell for the

31

responsibilities of the PTF letter carrier.  Harrison explained to Dewell how he, personally, handled the organization and preparation of mail for delivery for efficient delivery in relays.  Dewell had difficulty establishing his own organization and delivery strategy for walking loops.  Dewell never informed Harrison that he had suffered any medical or physical limitations that caused him difficulty in handling his duties as a carrier.  During Dewell's period of employment, Harrison was never aware that Dewell claimed to have any medical limitations.

As Harrison recalled, Dewell required assistance on almost all occasions when he was assigned a full delivery route.  On a number of occasions, Dewell required assistance to complete Route 23, a route which included no arduous geographical features that might make it any more physically demanding than any other mail route in Quincy.  Moreover, the driving time from one relay point to the next allowed the carrier to rest for a few minutes between relays.

During the entire period Dewell was working at the Post Office, the three supervisors commented to one another that Dewell was unable to

complete his daily assignment and another carrier had to assist him.  In the first 30 days, many carriers require assistance.  However, Dewell required another carrier's assistance and/or Dewell finished deliveries late, even though he had been on the job more than 30 days.

### III. ANALYSIS

### (A)

The entry of summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "Rule 56(c) mandates the entry of judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp., 477 U.S. at 322.  If a defendant can show the absence of some fact that the plaintiff must prove at trial, then the plaintiff must produce evidence, and not

merely restate his allegations, to show that a genuine issue exists.  Sartor v. Spherion Corp., 388 F.3d 275, 278 (7th Cir. 2004).  The Court construes all facts and makes all reasonable inferences in favor of the non-moving party.  Magin v. Monsanto Co., 420 F.3d 679, 686 (7th Cir. 2005).

Section 704 of the Rehabilitation Act provides, in pertinent part, that a "qualified individual with a disability in the United States . . . shall,  solely by reason of her or his disability [not] be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . or by the United States Postal Service."  29 U.S.C. § 794(a).  "[T]he prima facie case for discrimination is the same under the ADA and the Rehabilitation Act."  Burks v. Wisconsin Dept. of Transp., 464 F.3d 744,  756 n.12 (7th Cir. 2006).

The ADA and Rehabilitation Act "prohibit an employer from discriminating against a qualified individual with a disability because of the disability."  Garg v. Potter, 521 F.3d 731, 736 (7th Cir. 2008) (internal quotations and citations omitted).  To establish a prima facie case under the

34

Rehabilitation Act, a plaintiff must prove that (1) he is disabled pursuant to the ADA, meaning that he has a "physical or mental impairment that substantially limits a major life activity, a record of such impairment, or [is] regarded as having such impairment," see 42 U.S.C. § 12102(2); (2) is otherwise qualified to perform the job's essential functions, with or without a reasonable accommodation; and (3) has suffered an adverse employment action because of his disability.  Id.

One method that a plaintiff may use to defeat a summary judgment motion was first set out in McDonnell Douglas v. Green, 411 U.S. 792, 802-03 (1973).[1]  Although that was a Title VII case, the burden-shifting methodology employed in that case has been used in other types of employment discrimination cases.  See Weigel v. Target Stores, 122 F.3d 461, 465 (7th Cir. 1997)(applying the framework to an ADA claim).  A plaintiff must show that: (1) he is disabled; (2) he was meeting his employer's legitimate performance expectations; (3) he suffered an adverse employment action; and (4) his employer treated similarly-situated

---

[1]The Plaintiff does not allege that he has direct evidence of discrimination.

35

employees without a disability more favorably.  See Lloyd v. Swifty Transp., Inc., 552 F.3d 594, 601 (7th Cir. 2009).  If the plaintiff establishes a prima facie case, the burden shifts to the defendant who must then articulate a legitimate, non-discriminatory reason for the challenged action.  See id.  If the defendant meets its burden, the burden shifts back to the plaintiff who must then show that the defendant's articulated reasons are a pretext.  See id.

A "disability" is a "physical or mental impairment that substantially limits one or more of the major life activities."  42 U.S.C. § 12102(2)(A).  To be considered disabled under the definition in force at the time that Dewell was employed at the Postal Service, an individual must "have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives."  Toyota Motor Manufacturing, Kentucky, Inc. v. Williams, 534 U.S. 184, 198 (2002).  An individual cannot prove he is disabled under this test by simply submitting a medical diagnosis.  See id.

Factors to be considered when assessing whether an individual is

substantially limited in a major life activity include: "(i) The nature and severity of the impairment; (ii) The duration or expected duration of the impairment; and (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2). Working is a major life activity. See Duncan v. State of Wis. Dep't of Health & Family Servs., 166 F.3d 930, 935 (7th Cir. 1999).

(B)

The Court concludes that the Defendant is entitled to summary judgment for multiple reasons. The first inquiry involves whether Dewell is even disabled. As the Defendant alleges, Dewell's own physician, Dr. Ginos, and the Postal Service doctor–Dr. Wheeler–said that he had no disability. In his employment application, Dewell indicated that he had no "medical disorder or physical impairment which could interfere in any way with the full performance of duties of the position" of letter carrier. The Postal Service further notes that Dewell showed no disability while working

and he was healthy enough to play football.  Moreover, Dewell's supervisors regarded him as fully capable of performing the work of a letter carrier.

Dewell points to Dr. Ginos's records, which include Dr. Wheeler's reference to a ten percent disability sustained while serving in the Marine Corps, and his chronic lumbosacral spine strain.  Dewell further emphasizes that he receives compensation from the federal government due to the disability from his military service.  Dewell claims that he is a "qualified individual" who, under certain circumstances, can work around his disability.  Moreover, he contends that the Postal Service was aware of his disability, based on the findings of Dr. Wheeler and statements that Dewell is alleged to have made to others about his status.

In reply, the Defendant claims that the ten percent disability rating means that he simply is unable to carry a rifle or participate in the 3-mile run and weekly hikes with his battalion, none of which are tasks he would have to perform as a letter carrier.  Dewell could be described as having 90% of the physical capacity to be a Marine and 100% of the physical capacity to be a postal carrier.

38

The Court agrees with the Defendant that the determination made by the military simply does not apply to everyday life and that Dewell is unable to establish that he has a "physical or mental impairment that substantially limits one or more of the major life activities," pursuant to 42 U.S.C. § 12102(2)(A). Because Dewell's duties as a letter carrier would be different than those of a Marine, the ten percent determination made by the military is not particularly relevant. Even when the facts are viewed in a light most favorable to Dewell, he is unable to show that he is substantially limited in the capacity to work as a letter carrier because of a physical impairment. Consequently, the Court concludes that Dewell is unable to create a genuine issue of material fact as to whether he is disabled.

Dewell is also unable to show that he was meeting the Postal Service's legitimate expectations. Although Dewell acknowledges not meeting his employer's expectations at his 30-day review, Dewell disputes the Defendant's assertion that he had not improved to the level needed for a letter carrier by the time of his 60-day review. Dewell claims that he was told privately by Allen that he had improved and that management was

"happy" with his progress.  Moreover, Dewell states that the evaluation
form did not initially contain any "Unsatisfactory" markings.  He suggests
that it was altered after he saw the form while meeting with Allen.  Even if
Dewell's speculative claim is true, however, he is still not able to show that
he was meeting his employer's reasonable expectations.

This is because Dewell failed to report an incident while a
probationary employee.  In discussing the incident, Dewell states in his
brief:

> There is no evidence that Mr. Dewell was ever trained on the
> power cord aspect of this particular vehicle.  Moreover, he was
> hired and first put to work in a moderate weather month,
> September, and the cords are only affixed in colder weather.  As
> a practical matter, he did not know of the cord and, therefore,
> could not have known to disengage it.  Also, as noted above,
> even the Government's affiants cannot really decide among
> themselves where this power cord is actually placed.  One states
> an all around inspection will cause the carrier to "trip" over it.
> The other describes it at shoulder height.  The accident is clearly
> innocent, explainable and, at worst, human error of a relatively
> benign sort (with due regard for the importance of workplace
> safety).

The Court has reviewed the photographs of the mail trucks plugged into the
wall and observes that the power cord would have been  immediately

40

apparent to a carrier performing even a cursory vehicle inspection. It is unclear what kind of training Dewell expected so that he would have known to unplug the power cord from the wall before beginning his mail route. Presumably, he could have asked someone if he was unsure how to proceed.

The Defendant first notes that the accident should have been reported when it occurred. Dewell's explanation that he could not report the incident the same day because no supervisor was on the premises when he returned from his route is simply not credible. Although Dewell states that Atchley was not present, Dewell admitted in his EEO complaint that he only checked two places for a supervisor. While Atchley may not have been in one of those locations, that does not mean she was not on duty. It does not appear that Dewell made a concerted effort to locate a supervisor. Even when the facts are viewed in a light most favorable to Dewell, therefore, the Court concludes that he failed to report an incident as a probationary employee and, thus, was not meeting his employer's legitimate expectations.

The Court further concludes that Dewell is unable to establish the fourth element. Dewell has not created a genuine issue of material fact as

to whether the Postal Service treated any similarly situated employee differently than it treated him. Dewell did not dispute the Defendant's factual allegations pertaining to A.M. Specifically, they were not similarly situated for the following reasons: (1) A.M.'s reviews were generally positive; (2) A.M. immediately reported her accident, unlike Dewell; (3) A.M. was no longer on probation, unlike Dewell; and (4) A.M. was disciplined pursuant to the union contract. The record establishes that Dewell and A.M. were not similarly situated. Dewell does not point to any other employee in attempting to establish this element. Based on the foregoing, Dewell has not created a factual issue as to whether the Postal Service treated a similarly situated employee differently.

## IV. CONCLUSION

The Court concludes that Dewell is unable to create a genuine issue of material fact as to three of the necessary elements in order to prove a circumstantial case under the Rehabilitation Act. Therefore, Dewell cannot show that he is disabled under the Act or that he was terminated because of a disability. The Defendant is entitled to summary judgment.

<u>Ergo</u>, the Defendant's motion for summary judgment [d/e 40] is ALLOWED.

The Clerk will enter judgment in favor of the Defendant and against the Plaintiff.

ENTER: December 21, 2009

        FOR THE COURT:

                s/Richard Mills
                United States District Judge